AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
2/08/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____asi_____ DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>BRYON MARTINEZ, aka "Byron Martinez,"<br>JOSE SANTIAGO LEPIZ, and KERROL DAVIS<br>GOFF,<br><br>Defendants | Case No. 2:25-mj-00587-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 6, 2025 in the County of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

   *Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
_____
Complainant's signature

Brian Y. Joh, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: February 8, 2025

*Judge's signature*

City and state: Los Angeles, California

Hon. Alicia G. Rosenberg,
U.S. Magistrate Judge
*Printed name and title*

AUSA: Alexandra Kelly (x5010)

**AFFIDAVIT**

I, Brian Y. Joh, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of criminal complaints and arrest warrants against Bryon Martinez, also known as "Byron Martinez," ("MARTINEZ"), Jose Santiago Lepiz ("LEPIZ"), and Kerrol Davis Goff ("GOFF"), charging them with violating Title 21, United States Code, Section 841(a)(1)(Possession with the Intent to Distribute a Controlled Substance).

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

3. I have been employed as a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") since October 2023. I am currently assigned to the DEA's Los Angeles Field Division, Southwest Border Group 1 – Strike Force. I have received approximately 17 weeks of specialized training at the DEA Academy in Quantico, Virginia, involving use, possession,

packaging, manufacturing, sales, concealment, and transportation of various controlled substances, money laundering techniques, and conspiracy investigations.  I have participated in narcotics investigations and have debriefed defendants and witnesses who had personal knowledge of narcotics trafficking organizations.  From June 2017 to August 2021, I was a Marine Corps Officer and served with Marine Air Support Squadron 3 in Camp Pendleton, California.  Following my military service, I worked as an Emergency Medical Technician ("EMT") for Falck Ambulance Company serving the greater Los Angeles Area from December 2022 to June 2023.

       4. In the course of my employment with the DEA, I have participated in many aspects of narcotics investigations, including conducting physical surveillance, executing search warrants, directing confidential informants, and conducting arrests.  Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection and laundering of drug trafficking proceeds.  I am also familiar with methods employed by drug traffickers and large-scale drug trafficking organizations to impede detection by law enforcement, including the use of coded language, counter-surveillance, multiple vehicles, prepaid or debit calling cards, public telephones, cellular telephone technology, false or fictitious identities, and encoded communications.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

5.  In approximately June of 2024, the DEA conducted a controlled buy of approximately five pounds of methamphetamine using a Confidential Source (the "CS")[1]. That transaction was brokered by MARTINEZ, who communicated with the CS in the days leading up to the controlled buy and agreed to provide the methamphetamine to the CS via a third party. Following that deal, at the direction of the DEA, the CS made several attempts to contact MARTINEZ via the phone number that MARTINEZ used to facilitate that deal, but the number was no longer in service. As such, the CS lost contact with MARTINEZ until approximately the middle of September 2024, when the CS acquired a new number for MARTINEZ. The CS and MARTINEZ had some communication through that phone number until approximately early October, when the CS lost contact with MARTINEZ again.

6.  Then, on or about January 17, 2025, the CS reported to his/her DEA handler that he/she obtained MARTINEZ's new telephone number from a common associate. After the CS reported that development, the CS's handler directed the CS to call MARTINEZ on a recorded line and determine whether MARTINEZ was interested in selling more drugs to the CS. The CS complied and

---

[1] The CS was convicted and sentenced to 36 months' probation and 180 days in jail on a charge of grand theft from a person in 2002 in Orange County, CA. After pleading guilty to violations of 21 U.S.C. §§ 846, 841, and 18 U.S.C. § 922 in July 2023, in April 2024, the CS was sentenced to time served followed by five years of supervised release in the Central District of California. The CS has been paid $22,505.00 during the time he has worked as a CS for DEA. The CS's information has been corroborated throughout the investigation and deemed to be credible and reliable. The CS's information has led to the seizure of drugs, money, and guns in the past.

successfully reached MARTINEZ at his new number that same day. That contact set off a series of events that led to a DEA-led controlled operation that led to the seizure of approximately three kilograms of suspected heroin on February 6, 2025.

7. Between on or about January 17, 2025, and February 6, 2025, the CS and MARTINEZ spoke via telephone on a recorded line on approximately two dozen occasions. Some of those calls are described below, in substance and summary only[2]:

    a. On January 17, after the CS told MARTINEZ that he/she was interested in buying more drugs from MARTINEZ, MARTINEZ told the CS that he could help supply drugs to the CS in the future. Additionally, MARTINEZ asked whether the CS could help MARTINEZ find guns that MARTINEZ could send to associates in Mexico who were involved in ongoing hostilities between rival drug trafficking cartels. Before the conversation ended, MARTINEZ and the CS agreed to be in touch about possible drug deals in the future.

    b. On February 1, MARTINEZ called the CS and said that he had "negra," available for sale. In my training and experience, I know that "negra," is a common slang term for black tar heroin. MARTINEZ described further that he had "40 of them," which I believe based on my training and experience to mean that MARTINEZ had 40 kilograms of heroin available for

---

[2] The CS and MARTINEZ spoke Spanish to one another on those calls. The CS's DEA handler speaks fluent Spanish and he/she provided me with a verbal translation of the calls that I am describing throughout this affidavit.

4

sale.  MARTINEZ further told the CS that he hoped the CS could help him find customers for that heroin.

  c. Also on February 1, the CS called MARTINEZ and told MARTINEZ that the CS found a customer who was interested in buying heroin from MARTINEZ on February 5.[3]  Then, the CS told MARTINEZ that the customer wanted to send an associate to sample the heroin and then, if the associate believed the heroin was high quality, the customer would buy five kilograms from MARTINEZ.[4]  MARTINEZ expressed support for that plan and told the CS he would work to determine the price of the heroin and be in touch with the CS in the future.

  d. On February 4, MARTINEZ called the CS and told the CS that he believed the heroin he had was high quality, then sent the CS pictures of the heroin via text message.  Then, before MARTINEZ and the CS ended their call, they agreed to be in touch the following day to finalize the details of their previously planned drug deal.

  e. On February 5, after a call where MARTINEZ told the CS he had a sample of heroin ready for the CS's customer, the CS called MARTINEZ and told MARTINEZ that he/she would

---

[3] Before this call, the CS conferred with his/her DEA handler who instructed the CS to call MARTINEZ and tell him that the CS knew a third party (who in this case was fictitious) who wanted to buy heroin.  My reference to the CS's "customer," throughout this affidavit, then, is to a fictitious customer.

[4] I know from my training and experience that it is common practice for a person that is buying heroin in bulk to send a heroin user to sample the heroin on offer to help determine its quality.

5

contact his customer and reach out to MARTINEZ later once the customer was prepared to meet.

      f.  Later on February 5, the CS called MARTINEZ and told MARTINEZ that his/her customer was prepared to receive the sample from MARTINEZ, but MARTINEZ told the CS that he dropped the sample off to someone else. MARTINEZ said further that the person who received that sample thought it was low quality, so MARTINEZ preferred to move the planned deal with the CS's customer to the following day. The CS agreed.

      g.  On February 6, the CS called MARTINEZ and said that his/her customer was prepared to meet MARTINEZ at 1:30 p.m. MARTINEZ told the CS that he too was prepared to move forward with the deal. Following that conversation, the CS sent a text message to MARTINEZ that contained the address of a Mexican restaurant in Pomona (the "Restaurant"), thereby setting the location of the planned deal.

      h.  Later on February 6, MARTINEZ sent a voice message to the CS where MARTINEZ said he was picking up the sample of heroin from a third location and would be arriving at the planned site of the deal in approximately 15 minutes.

    8.  Approximately 20 minutes after the CS received the voice message described above, law enforcement agents and officers who were conducting surveillance near the Restaurant saw a silver Honda Civic (the "Civic") enter the parking lot outside the Restaurant. After the Civic entered the parking lot, the CS received a call from MARTINEZ where MARTINEZ told the CS that he had arrived at the deal location. In response,

6

the CS told MARTINEZ that his/her customer was sitting inside a white Mercedes sedan (the "Mercedes") that was parked in the same parking lot.[5]

9. Then, agents and officers conducting surveillance saw the Civic drive toward the Mercedes. According to the UC, after the Civic approached, he/she exited the Mercedes and saw that MARTINEZ was driving the Civic and there was another male in the passenger seat. The UC greeted MARTINEZ, then MARTINEZ handed the UC a cigarette box. When the UC looked inside the cigarette box, he/she saw that it contained three units of what the UC believed to be heroin: one unit was wrapped inside of what appeared to be a black plastic glove, the other two were wrapped inside saran wrap. Then, the UC reentered the Mercedes and MARTINEZ drove away in the Civic.

10. Approximately an hour and a half after the transaction between MARTINEZ and the UC, the CS placed a recorded call to MARTINEZ. During that call, in substance and summary, the CS told MARTINEZ that the CS's customer wanted to go forward and buy three kilograms of heroin. MARTINEZ said he was prepared to proceed and agreed to provide the three kilograms of heroin in exchange for $26,500. The CS agreed to that price and the pair agreed that the exchange of drugs for money would happen that same day in the parking lot of the Restaurant.

11. Approximately five minutes later, MARTINEZ called the CS and, in substance and summary, confirmed that he was ready to

---

[5] That customer was, in fact, an undercover law enforcement officer (the "UC").

proceed with the deal and planned to send a "Salvadorian," male to deliver the three kilograms of heroin. When the CS asked for a description of the car the "Salvadorian," male would be driving, MARTINEZ told the CS that he would provide that information in a subsequent phone call. The call ended. Then, approximately 15 minutes later, MARTINEZ placed another call to the CS and told the CS that the "Salvadorian," male was driving a silver Volkswagen Jetta (the "Jetta").

12. Approximately an hour after the call where MARTINEZ told the CS that the "Salvadorian," male was driving a Jetta, law enforcement officers and agents who were conducting surveillance around the Restaurant saw a silver Volkswagen Jetta occupied by two males enter the parking lot outside the restaurant and park. At that point members of the surveillance team decided to send a marked California Highway Patrol ("CHP") car to drive through the Restaurant's parking lot near the Jetta to see if the CHP car's presence would provoke a reaction from the occupants of the Jetta.

13. Soon after the CHP car drove near the Jetta, members of the law enforcement surveillance team saw the Jetta drive to a different parking space in the parking lot. Soon after the Jetta moved, MARTINEZ called the CS and told the CS that he wanted to change the location of the deal. Given these facts and based on my training and experience, I believe that the occupants of the Jetta contacted MARTINEZ and informed him of the presence of the CHP, which caused MARTINEZ to change the planned location of the deal.

14. Approximately a minute after the call where MARTINEZ changed the location of the deal, members of the law enforcement surveillance team saw the Jetta drive out of the parking lot next to the Restaurant. Ultimately, the Jetta drove to the parking lot outside a nearby Stater Brothers grocery store where it was stopped by a marked CHP cruiser. When the CHP officers from that marked cruiser approached the Jetta, they saw that it was occupied by two men: LEPIZ (who was driving) and GOFF (who was seated in the front passenger seat).

15. A short time later, a trained drug detection dog sniffed the exterior of the Jetta and alerted to the presence of drugs inside the car. Then, law enforcement agents and officers searched the Jetta and found a white trash bag on the rear passenger side floorboard. Inside that bag were three large bindles that appeared to weigh approximately a kilogram each. DEA agents cut open the bindles and discovered that it contained a substance that appeared to be heroin. When DEA agents field tested the suspected heroin, the test returned a presumptively positive result for the presence of opium alkaloids.[6]

---

[6] During some of the above-described approximately two dozen phone calls between MARTINEZ and the CS, MARTINEZ described in substance and summary how he had manipulated his supply of heroin in an effort to mix it with additional materials and increase its volume. This is a common process often referred to as "cutting," a practice designed to increase the profit margins of drug dealers. I believe it is likely that the field tests used in this case are detecting the chemicals used to cut the heroin and not the heroin itself. The suspected heroin will be submitted to the DEA Southwest Lab in the coming days where it will be tested with more sophisticated testing methods that can better detect the presence of heroin.

## IV. CONCLUSION

16. For all the reasons described above, there is probable cause to believe that MARTINEZ, LEPIZ, and GOFF committed violations of Title 21, United States Code, Section 841(a)(1)(Possession with the Intent to Distribute a Controlled Substance).

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __8th__ day of February 2025.

*Alicia G. Rosenberg*
_____
ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE

10